## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 20-21511-CIV-MARTINEZ/AOR

HELEN BURKES,

      Plaintiff,

v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,[1]

      Defendant.

_____/

### REPORT AND RECOMMENDATION

THIS CAUSE is before the Court upon Plaintiff Helen Burkes' ("Claimant") Motion for Summary Judgment (hereafter, "Claimant's Motion for Summary Judgment") [D.E. 18] and Defendant Kilolo Kijakazi, Acting Commissioner of Social Security's ("Commissioner") Motion for Summary Judgment with Supporting Memorandum of Law and Opposition to Plaintiff's Motion for Summary Judgment (hereafter, "Commissioner's Motion for Summary Judgment") [D.E. 19].  The administrative transcript (hereafter, "TR.") has been filed [D.E. 11].[2]  For the reasons stated below, the undersigned respectfully recommends that Claimant's Motion for Summary Judgment be DENIED, the Commissioner's Motion for Summary Judgment be GRANTED, and the Commissioner's decision be AFFIRMED.

---

[1] Kilolo Kijakazi became Acting Commissioner of Social Security on July 9, 2021.  Pursuant to Federal Rule of Civil Procedure 25(d), Kilolo Kijakazi should be substituted for Andrew Saul as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 405(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] The references hereafter (TR. __) are to the transcript pages rather than the court record pages.

## PROCEDURAL HISTORY

Claimant filed an application for disability insurance benefits ("DIB") and an application for supplemental security income ("SSI") on September 11, 2017, alleging a disability onset date of April 5, 2017.  TR. 98.  The application was denied initially and upon reconsideration.  Id.  Upon Claimant's written request, a hearing was held on February 12, 2019, before Administrative Law Judge James Cole Cartledge ("ALJ Cartledge"), at which Claimant and Vocational Expert Heidi Feder ("VE Feder") testified.  Id. at 98.

On March 18, 2019, ALJ Cartledge issued an Unfavorable Decision, finding the following:

(1) Claimant met the insured status requirements of the Social Security Act through December 31, 2022.  Id. at 100.

(2) Claimant had not engaged in substantial gainful activity since April 5, 2017, the alleged disability onset date (20 C.F.R. § 404.1571 et seq. and 416.971 et seq.).  Id.

(3) Claimant had the following severe impairments: other and unspecified arthropathies; peripheral arterial disease; and depressive, bipolar, and related disorders (20 C.F.R. §§ 404.1520(c) and 416.920(c)).  Id.

(4) Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  Id. at 101.[3]

(5) Claimant had the residual functional capacity (hereafter, "RFC") to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), subject to additional limitations.  Id. at 103.[4]

---

[3] The Social Security Administration's ("SSA") Listing of Impairments "describes for each of the major body systems impairments that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. § 404.1525(a) and 416.925(a).

[4] The RFC is the ability of a claimant to do physical and mental work activities on a sustained basis, despite the claimant's limitations or impairments.  20 C.F.R. § 416.945(a)(1).  The RFC must be determined based on all of the claimant's impairments, even those that are not considered "severe."  See 20 C.F.R. §§ 416.920 and 416.945.  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 416.967(b).

(6) Claimant was able to perform past relevant work as a daycare worker, and as a housekeeping cleaner.  This work did not require the performance of work-related activities precluded by Claimant's RFC (20 C.F.R. §§ 404.1565 and 416.965).  Id. at 109.[5]

(7) Claimant had not been under a disability, as defined in the Social Security Act, from April 5, 2017, through the date of the Unfavorable Decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).  Id.

On February 10, 2020, the Appeals Council denied a request for review of ALJ Cartledge's Unfavorable Decision.  Id. at 1-4.  On April 9, 2020, pursuant to 42 U.S.C. § 405(g), Claimant filed this action seeking reversal of ALJ Cartledge's final administrative decision [D.E. 1].

In support of her contention that ALJ Cartledge's Unfavorable Decision should be reversed, Claimant argues that:

I.      The ALJ erred by failing to make findings regarding Claimant's need for an assistive device.

II.     The ALJ erred by mischaracterizing the nature of, and failing to properly address, probative vocational evidence demonstrating Claimant cannot perform her past work.

See Claimant's Motion for Summary Judgment [D.E. 18-2].  The undersigned finds no merit in either of these contentions.

---

[5] "Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it."  20 C.F.R. §§ 404.1560(b)(1) and 416.960(b)(1).

## RELEVANT MEDICAL EVIDENCE

I.   **Physical Health Providers**

   **A.  Treating Sources**

      **1)  West Perrine Health Center**

On May 4, 2017, Claimant was seen by Toni Lalla Torres, PA ("PA Torres") as a walk-in patient for lab results and continued care.  Id. at 429.  Claimant's active problems were hypertension, hemoccult positive stool, hyperlipidemia, and nicotine dependence.  Id.  Claimant was taking the following medications: a beta blocker; and an antihypertensive drug.  Id.  She reported no recent severe illness or injury; and no recent surgery, and that she was medication compliant and was not taking any over-the-counter medications.  Id.  Claimant reported that she smoked, did not use drugs or alcohol, exercised regularly, and had a sedentary lifestyle.  Id. at 430.  A review of systems was unremarkable, as follows: Claimant had no headache, no neck pain or neck stiffness, no chest pain or discomfort, normal appetite, no changes in urinary habits, no musculoskeletal symptoms, no arthralgias, no dizziness or lightheadedness, and no skin lesions or rashes.  Id.  Claimant's blood pressure was 128/75.  Id.  Claimant reported that her pain level was 0 and denied having any pain.  Id. at 431.  On physical exam, Claimant appeared well developed and in no acute distress; no abnormalities were noted; Claimant refused a genital and rectal exam. Id. at 431-32.  Claimant's musculoskeletal system was normal; no sensory abnormalities were noted; her balance, gait, and stance were normal; her appearance was normal; her mood was euthymic; and her affect was normal.  Id. at 432.  Claimant was diagnosed with hyperlipidemia and hypertension, and was counseled to decrease salt intake, walk for 30 minutes per day, and take blood pressure medication daily.  Id. at 432-33.

### 2)  Community Health of South Florida

On November 2, 2017, Claimant was seen by Au-Co Nguyen, D.O. ("Dr. Nguyen") for hospital follow up, after having presented to Homestead Hospital five days before for on-and-off chest pain.  Id. at 482.  Claimant reported that she was given an opioid pain medication and that her EKG was normal.  Id.  She reported that her joints had been hurting for the prior 2 months, and that it was worse when she woke up and at night, and better when she walked.  Id.  She reported that she was taking over-the-counter pain medication.  Id.  A review of systems was unremarkable. Id. at 483.  Claimant's blood pressure was 132/86; she reported her pain level was 10, and the pain was present in her whole body.  Id.  On physical exam, Claimant appeared well developed and in no acute distress; no abnormalities were noted except that, in Claimant's musculoskeletal system: her fingers showed abnormalities including nodes and tenderness on palpation; and her hands, wrists, knees, and feet showed abnormalities.    Id. at 484-85.  Claimant was diagnosed with hypertension, arthritis, costochondritis (Tietze's syndrome), and mild to moderate symptoms on her standardized depression screening.  Id. at 485.  Claimant reported feeling tired nearly every day; having decreased concentration ability; feeling restless, hopelessness, or depressed; and experiencing sleep disturbances; but she denied suicidal ideations or low self-esteem.  Id. at 485-86.  Claimant reported that activities of daily living were somewhat difficult for her due to depression symptoms as identified in the PHQ-9 questionnaire.  Id. at 486.[6]  Claimant was prescribed a nonsteroidal anti-inflammatory drug, a statin, and a beta blocker, was counseled on proper diet, and was advised to repeat depression screening in 1 year.  Id.

---

[6] The PHQ-9 (Patient Health Questionnaire) is a "self-administered tool[ ] for assessing depression." *Patient Health Questionnaire*, American Psychological Association, https://www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/patient-health.

On November 21, 2017, Claimant was seen by Dr. Nguyen for follow up for hypertension. Id. at 470.  Claimant reported no headache, epistaxis, chest pain or discomfort, dyspnea, dizziness, or sleep disturbances.  Id.  She stated that she had an allergic reaction to hair dye, for which she was given an Epi-Pen and an antihistamine, which helped resolve the swelling in her face.  Id.  She reported that she was compliant with her medication.  Id.  She reported that she had generalized pain in the legs, arms, and chest, and that the nonsteroidal anti-inflammatory drug did not help. Id.  She reported no recent severe illness or injury, surgery, hospitalization, or visits to the ER.  Id. A review of systems was unremarkable.  Id. at 471.  Her blood pressure was 161/79.  Id. at 472. On physical exam, Claimant appeared well developed and in no acute distress; no abnormalities were noted except that Claimant's musculoskeletal system had 18 positive trigger points.   Id. at 473.   Claimant was diagnosed with hyperlipidemia and hypertension, nicotine dependence, prediabetes, risk for fibromyalgia, and sickle cell trait.  Id.  Claimant had clinically significant symptoms for depression.  Id. at 474.  Claimant reported that activities of daily living were somewhat difficult for her due to depression symptoms, as identified in the PHQ-9 questionnaire. Id.  Claimant was prescribed exercises and counseled on proper diet.  Id. at 475.  Claimant was also prescribed an antidepressant and referred to a behavioral health counselor.  Id.

On December 15, 2017, Claimant was seen by Michael Nilmeier, D.O. ("Dr. Nilmeier") as a walk-in patient.  Id. at 465.  Claimant complained of non-radiating chest discomfort/pressure without dyspnea and palpitations for the past three months, without exacerbating or relieving factors; she also complained of bilateral shoulder pain and weakness with decreased range of motion - without injury, paralysis, or swelling - for the past three months, without exacerbating or relieving factors.  Id.  Claimant's medications were calcium channel blocker, statin, diuretic, antidepressant, and an EpiPen in case of emergency.  Id.  She reported no recent severe illness or

injury, surgery, hospitalization, or visits to the ER.  Id.  Claimant reported that she smoked, did not use drugs or alcohol, and was not exercising regularly.  Id. at 466.  A review of systems was unremarkable except for chronic musculoskeletal condition and bilateral arm weakness and numbness.  Id.  Claimant's blood pressure was 139/85.  Id.  Claimant reported that her pain level was 10, located in both arms and the right side of her chest.  Id. at 466.  On physical exam, Claimant appeared well developed and in no acute distress; no abnormalities were noted except for the following in the musculoskeletal system: nodules on fingers of both hands and on the radial aspect of the right wrist; and tenderness on palpation of the shoulders, with decreased active and passive motion of both shoulders, and abnormal shoulder abduction and external rotation.   Id. at 467.  Claimant was diagnosed with hyperlipidemia and hypertension, nicotine dependence, prediabetes, risk for fibromyalgia, and sickle cell trait.  Id.   Claimant was counseled to maintain a healthy diet with proper diet and exercise.  Id. at 468.

On September 14, 2018, Claimant saw Prema L. Ramsahai, D.O. ("Dr. Ramsahai") for an annual medical exam and to establish care as a new patient.  Id. at 751.  Claimant's chief complaint was body aches that had started a year before.  Id.  She reported: that her body aches had been getting worse over the past year, and that none of the pain medications were working; that she had anxiety and depression issues; that she did not go outside to walk or do physical activity; and that she saw her therapist weekly for help.  Id.  Dr. Ramsahai explained to Claimant that if she did not move, her muscles and joints would get stiff.  Id.  Claimant reported no fall, trauma, or other injury in the past year.  Id.  Claimant was diagnosed with hypertension.  Id. at 752.  Claimant stated that she had no difficulty feeding herself, dressing, washing, or doing her own shopping.  Id. at 753.  Claimant's blood pressure was 117/74.  Id. at 754.  A review of systems was unremarkable except for neck pain and arthralgias and pain localized to one or more joints.  Id.  Dr. Ramsahai noted that

Claimant was well-appearing, well developed, well nourished, and in no acute distress.   Id. Claimant stated that she had body pain which she rated at a level of 3.   Id. at 755.   Claimant's physical exam findings were unremarkable, except for back tenderness on palpation, mildly distended abdomen, and abnormalities in the musculoskeletal system.   Id.   Her speech, appearance, and affect were normal.   Id. at 755-56.   Claimant reported in the PHQ-9 questionnaire that in the prior two weeks: she was not feeling tired, nor having little energy; she was not feeling restless, hopeless, down, or depressed; she had sleep disturbances for more than half the days; she experienced loss of pleasure from usual activities; she did not wish to be dead or hurt herself; she did not have low self-esteem; and activities of daily living were somewhat difficult due to depression symptoms.   Id. at 756.   Claimant was assessed with generalized pain, lower back pain, essential hypertension, prediabetes, myalgia and myositis, and nicotine dependence.   Id.   Claimant tested negative for symptoms of depression on the standardized depression screening.   Id.

On January 16, 2019, Claimant saw Katleen Thermezy, ARNP ("ARNP Thermezy") complaining of back pain and generalized muscle pain, and to have a functional assessment for disability form completed.   Id. at 987.   Claimant had elevated lipids and a statin drug was prescribed; she requested a referral to rheumatology.   Id. at 988.   A review of systems revealed musculoskeletal arthralgias and pain localized to one or more joints.   Id. at 989.   Claimant's blood pressure was 132/70.   Id.   On physical exam, ARNP Thermezy noted that Claimant was well developed, well nourished, and in no acute distress; that she had musculoskeletal pain in multiple articulations; and that she used a cane sometimes for ambulation.   Id. at 990.   A standardized depression screening revealed no significant symptoms.   Id.   ARNP counseled Claimant on exercises and referred her to a rheumatologist.   Id. at 991.

On January 30, 2019, ARNP Thermezy wrote Claimant a prescription for a cane to help with ambulation.  Id. at 414.

### 3)  Carlos M. Martinez, M.D. ("Dr. Martinez")

On February 14, 2018, Plaintiff underwent a physical exam by Dr. Martinez.  Id. at 490. Plaintiff complained of having had constant pain all over her body, mainly around her chest and anterior area, since October 2017 when she presented to the hospital but without any positive findings.  Id.  She stated that she had right shoulder pain which was spreading throughout her body. Id.  She had a past medical history of sickle cell trait, hypertension, bipolar disorder, crest syndrome, bronchitis, degenerative disc disease since 1999, rheumatoid arthritis, and dermatitis. Id.  She stated that she could drive, was married with no children, lived with her husband, had an 11th grade education, smoked, denied drug abuse, and had worked at a childcare center until April 2017.  Id.  She stated that she did all of her activities of daily living at her own pace.  Id.

On physical exam, Dr. Martinez noted that Claimant was well developed and well nourished; in no distress; well-groomed and dressed; with normal affect; stood straight and was well balanced; had normal gait; exhibited no limps; was able to walk on toes and heels without difficulty; did not use any assistive devises; did not need help changing for the exam; and rose from the chair and table without difficulties.  Id. at 491.  Her skin, head and face, eyes, ears, nose and throat, neck, chest, lungs, heart, abdomen were normal; her teeth were in very poor condition; Claimant stated that she had pain in both breasts.  Id. at 491.

Claimant's extremities showed no clubbing, cyanosis, or edema; there was no evidence of peripheral vascular disease or varicose veins; no atrophy and no muscular weakness or loss of motor activity in any extremity; however, she had nodules on all distal phalanxes of all digits on both hands which were tender.  Id. at 492.  Her hands and fingers dexterity remained intact; she

was able to pick up small objects and turn a knob with either hand without difficulties.  Id. Claimant had no apparent muscular wasting; there was no visible or palpable bony or joint abnormality other than on the small joints of her hands; her bilateral muscle tone and strength were normal, 5/5 on a scale of 5/5; her straight leg raisings--from supine and sitting--were within normal range; her thoracic spine revealed no scoliosis or kyphosis; her joints revealed no evidence of subluxation, contractures, ankylosing, swelling, erythema, or fluid; and there was no evidence of trigger points.  Id.

On mental exam, Claimant related normally and denied any illusions, delusions, hallucinations, or suicidal tendencies; she was well oriented to person, place and time and well informed; she denied any constriction of interest or restriction of activities other than those imposed on her by her generalized aches and pains; she performed simple arithmetic accurately and rapidly; she recalled 4 objects out of 5 after approximately 20 minutes and performed two step instructions without difficulty; and she appeared able to manage her own finances well.  Id.

Dr. Martinez noted that: Claimant complained of generalized body aches and pains; she had hypertension and chest dermatitis that resembled eczema; she had history of sickle cell trait and bipolar disorder; and she had an apparent history of crest syndrome.  Id. at 493.  Dr. Martinez also noted that Claimant did not appear to have limitations with respect to activities requiring normal standing, walking, climbing a few steps, bending, carrying objects, or sitting, or limitations with respect to her upper extremities for gross motor activities.  Id.  Dr. Martinez suggested that Claimant follow up with a rheumatologist.  Id.

### B.  Non-treating Sources

#### 1)  State Agency Medical Consultant Cristina Rodriguez, M.D. ("Dr. Rodriguez")

On October 30, 2017, Dr. Rodriguez completed a medical evaluation and concluded that Claimant's physical impairments were non-severe and Claimant was not disabled.  Id. at 157-60. Claimant's alleged conditions were chronic obstructive pulmonary disease ("COPD"), bronchitis, back issues, arthritis, sickle cell, and high blood pressure.  Id. at 158.  Dr. Rodriguez opined that: Claimant's physical exams were basically all benign; Claimant had no organ damage, no diagnosis of COPD or sickle cell disease, and no exacerbations due to respiratory disease.  Id.  Dr. Rodriguez further opined that Claimant's medically determinable impairment was hypertension, which did not significantly limit physical or mental activity to do basic work activities.  Id.

#### 2)  State Agency Medical Consultant Thomas Renny, D.O. ("Dr. Renny")

On February 26, 2018, Dr. Renny completed a Physical RFC Assessment for Claimant.  Id. at 180-82.  Dr. Renny opined that Claimant had the following exertional limitations: she could lift and/or carry up to 20 pounds occasionally and up to 10 pounds frequently; she could stand and/or walk and sit for a total of 6 hours in an 8-hour workday with normal breaks; she was unlimited in her ability to push and/or pull.  Id. at 180.

Dr. Renny opined that Claimant could frequently climb ramps or stairs, ladders, ropes or scaffolds, balance, stoop, kneel, crouch, crawl,  or crawl.  Id. at 180-81.  Dr. Renny stated that Claimant's claimed postural limitations were based on her subjective symptoms.  Id. at 181.  Dr. Renny opined that Claimant had unlimited ability to feel or to reach in any direction; but her ability to handle and finger was limited to frequently in both hands.  Id. at 181.  Dr. Renny opined that Claimant had the following environmental limitations: she should avoid concentrated exposure to

extreme cold, humidity, and vibration; but her ability to be exposed to extreme heat, wetness, noise, hazards, fumes, odors, dusts, gases, or poor ventilation was unlimited.  Id. at 181-82.  Dr. Renny further opined that Claimant had no visual or communicative limitations.  Id. at 181.

## II.  Mental Health Providers

### A.  Treating Sources

#### 1)      Community Health of South Florida

On November 21, 2017, Claimant received a psychiatric evaluation from Courtney Rosenthal, D.O. ("Dr. Rosenthal") to establish care with a psychiatrist.  Id. at 866.  Claimant had a past medical history of polysubstance abuse, hypertension, hyperlipidemia, prediabetes, sickle cell trait, and an allergic reaction to hair dye for which she had been seen at urgent care the previous day.  Id. at 866.  Claimant was dressed appropriately and well-groomed; and reported that she wanted help because she was struggling with diffuse pain of two months' duration which had caused her to experience apathy, anhedonia, no motivation, and problems with sleep, appetite, energy, and concentration.  Id.  Claimant reported that she left home at age 14 after her mother died, which led to her living on the streets and doing drugs; this resulted in significant trauma, including multiple rapes and being shot and cut with a knife.  Id.  She had symptoms of post-traumatic stress disorder ("PTSD") including daily flashbacks, hypervigilance, being easily startled, and irritability.  Id.  She reported feeling hopeless, helpless, and worthless.  Id.  She admitted to a history of two suicide attempts but denied suicidal ideation.  Id.  She reported that she had never seen a psychiatrist or been treated for a psychiatric condition in the past.  Id.  Claimant's chief complaint was PTSD from trauma and recurrent intrusive memories of a past event.  Id.  Claimant reported a history of heavy alcohol use and at least 15 years of daily cocaine use, but she quit in 1996 when she entered a drug program; she had remained clean since.  Id. at 867.  On mental status exam, Dr. Rosenthal noted that: Claimant had casual dress, normal

grooming and  hygiene; her attitude was cooperative; she had no unusual movements; her eye contact was fair; her speech was coherent; her affect was normal; her thought process was goal-directed and logical; she denied suicidal or homicidal ideations; she denied hallucinations or delusions; she was orientated to person, place, and time; her short and long term memory were intact; and her insight and judgment were fair.  Id. at 868.  Claimant was diagnosed with PTSD. Id.  Dr. Rosenthal prescribed a psychotropic medication and referred her for individual therapy. Id. at 869.

On November 29, 2017, Claimant underwent a biopsychosocial exam by Jaleesa Barrett ("Ms. Barrett").  Id. at 859.  Claimant reported that she did not feel like herself and did not know what was wrong; she felt paranoid that people were talking about her, and she did not have the desire to leave the house.  Id. Claimant reported the following symptom: severe depressed mood and sleep disturbance; severe fatigue, delusions, and guilt; moderately poor attention; poor grooming; mood swings; agitation; aggressive behaviors; irritability; panic attacks; phobias; obsessions; and feelings of worthlessness.  Id. at 859-60.  Claimant's overall health was fair; she reported sharp chest and shoulder pain which she rated at a level 9.  Id. at 860.  Claimant reported that she had to raise herself starting at the age of 14 because of her mother's passing, and that she experienced physical, verbal, or sexual abuse from others.  Id. at 861.  Claimant was 5'4" tall and 147 pounds; she reported that her weight was stable.  Id.  She reported cocaine, crack, and marijuana abuse from ages 14-36, which resulted in jail time and rehabilitation.  Id.  She reported that she was able to care for herself and was completely independent.  Id. at 861-62.  She stated that she isolated herself; she was of normal intelligence; her housing was adequate, and she had a supportive network; she was unemployed; and she had completed 8th grade.  Id. at 862.  She reported past trauma, and that she did not want to be around other people because she got nervous

and anxious around people.  Id.  She reported that she did a lot of drugs and was in and out of jail

for the majority of her life; that she was sad, lonely, scared, and confused; and that she was anxious

all the time.  Id. at 863.  She stated that she wanted to find out what was wrong with her and be

who she used to be; she stated that she was in an abusive relationship and that she had twice

attempted suicide in the past.  Id.  On mental status exam, Claimant had casual dress, normal

grooming and hygiene; her attitude was calm and cooperative; she had no unusual movements; her

speech was normal; her affect reactive; her mood was congruent and euthymic; her thought process

was goal-directed and logical; she denied suicidal or homicidal ideations; she denied

hallucinations; she was orientated to person, place, and time; her short memory was intact; and her

insight and judgment were good.  Id. at 864.  Her Global Assessment of Functioning ("GAF")

score was 70.  Id. at 865.[7]

On January 22, 2018, Claimant followed up with Dr. Rosenthal for medication

management.  Id. at 841.  She reported that her antidepressant and antipsychotic medications

helped her, and she was compliant with her medications, but she experienced dry mouth as a side

effect.  Id.  She reported continued problems with sleep, appetite, and concentration, but felt her

energy was a little better in the morning after she took her antidepressant medication.  Id.  She

reported she got out of bed to smoke when she woke up at 2 AM or 4 AM, and she was advised

that this could be interfering with her ability to sleep.  Id.  She reported walking her dog every

morning at 7 AM; only eating once per day; feeling hopeless, helpless, and worthless; and that she

---

[7] "Global assessment of functioning is the clinician's judgment of the individual's overall level of
functioning, not including impairments due to physical or environmental limitations."  Vargas v. Astrue,
No. 07-CV-60776, 2008 WL 4056164, at *3 (S.D. Fla. Aug. 25, 2008).  "A GAF score of 61-70 indicates
some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational,
or school functioning (e.g., occasional truancy, or theft within the household)."  Mathis v. Astrue, No. 3:06-
CV-816-J-MCR, 2008 WL 876955, at *7 (M.D. Fla. Mar. 27, 2008) (citing Diagnostic and Statistical
Manual of Mental Disorders (DSM-IV) at 32 (4th ed.1994)).

was not leaving the house.  Id.  On mental status exam, Dr. Rosenthal noted that: Claimant had casual dress, normal grooming and  hygiene; her attitude was cooperative; her eye contact was good; her speech was coherent and fluent; her affect was constricted; her thought process was goal-directed and logical; she denied suicidal or homicidal ideations; she reported paranoia and visual hallucinations of her mother; she was orientated to person, place, and time; her short and long term memory were intact; and her insight and judgment were fair.  Id. at 841-42.  Dr. Rosenthal adjusted her medications and advised her to continue individual therapy, discussed basic sleep hygiene and encouraged her to stop smoking in the middle of the night, and encouraged her to seek some kind of work activity.  Id. at 842.  Dr. Rosenthal noted that Claimant showed slight improvement.  Id. at 843.

On February 21, 2018, Claimant followed up with Dr. Rosenthal for medication management.   Id. at 837.   Claimant reported that her medications were helping, but the antidepressant was no longer improving her energy and the antipsychotic was not helping her sleep.  Id.  She reported having about 2-3 flashbacks per week, which represented a reduction from daily flashbacks prior to starting medication, fewer auditory hallucinations, and no further visual hallucinations.  Id.  She reported feeling suicidal but that she had made no attempts to hurt herself, and that she continued to feel hopeless and helpless and was self-isolating at home.  Id.  She reported no side effects from medication other than increased appetite.  Id.  On mental status exam, Dr. Rosenthal noted that: Claimant had casual dress, normal grooming and  hygiene; her attitude was cooperative; she displayed no unusual movements; her eye contact was fair; her speech was coherent and fluent; her affect was normal; her mood was stressed; her thought process was goal-directed and logical; she denied suicidal or homicidal ideations; she reported paranoia that sometimes people were talking about her; she denied hallucinations; she was orientated to person,

place, and time; her short and long term memory were intact; and her insight and judgment were fair.  Id. at 837-38.  Dr. Rosenthal adjusted her medications and advised her to continue individual therapy and not to smoke after 6 PM.  Id. at 838-39.

On March 26, 2018, Claimant received individual therapy from Karla Correa, MS ("Ms. Correa").  Id. at 828.  Claimant reported that she had been exposed to a traumatic event and reported depression, fear, and disassociation.  Id. at 829.  On mental status exam, Ms. Correa noted that: Claimant was oriented to person, place, time, and situation; her appearance, motor activity, and speech were within normal limits; her behavior was cooperative and engaged; her mood was depressed; her affect was congruent; her thought content and processes were paranoid and pessimistic; her insight and judgment were fair; she was moderately motivated; she denied suicidal or homicidal ideation, threat, gesture, or rehearsal attempt.  Id.  Claimant reported feeling depressed and sad and that she was isolating from others.  Id.  Claimant reported that her stressors were financial stress and sleep disturbances and reported paranoid thoughts that people made fun of her.  Id. at 829.

Also on March 26, 2018, Claimant saw Dr. Rosenthal for medication management.  Id. at 831.  Claimant reported that: she had been compliant with her medications, but she was still depressed; she drank 1-3 beers per night to help her sleep, and that she went back to sleep after taking her medication and walking her dog in the morning and slept until 2-3 PM; she heard voices and saw her mother at night; and she was compliant with her medication and, aside from sleeping in the daytime, denied medication side effects.  Id.  On mental status exam, Dr. Rosenthal noted that: Claimant had casual dress, normal grooming and  hygiene; her attitude was cooperative; her eye contact was good, her speech was coherent and fluent; her affect was constricted; her thought process was goal-directed and logical; she denied suicidal or homicidal ideations; she reported

paranoia that people were talking about her and hallucinations of her mother; she was oriented to person, place, and time; her short and long term memory were intact; and her insight and judgment were fair.  Id. at 841-42.  She was diagnosed with PTSD and major depressive disorder, single episode, severe with psychotic features.  Id.  Dr. Rosenthal adjusted Claimant's medication and advised her to continue individual therapy and follow up with her primary care provider and cardiologist.  Id. at 842.  Dr. Rosenthal encouraged Claimant to seek some kind of work activity, even part time, to establish a routine and provide her with a sense of purpose.  Id.

On August 21, 2018, Claimant saw Kevin Amiri, D.O., ("Dr. Amiri") for medication management.  Id. at 714.  Dr. Amiri noted that Claimant had a past medical history of PTSD, polysubstance abuse, hypertension, hyperlipidemia, pre-diabetes, and sickle cell trait.  Id. Claimant reported that she felt tired and drowsy during the day due to medication, and that she had perceptual disturbances in the form of hearing her mother's voice at night; she denied suicidal or homicidal ideations.  Id.  On mental status exam, Dr. Amiri noted that: Claimant had normal appearance, grooming, and hygiene; her attitude was cooperative; she had no unusual movements; her eye contact was good; her speech was coherent; her affect was within normal range; her mood was euthymic; her thought process was goal-directed and logical; she denied suicidal or homicidal ideations, delusions, phobias, obsessions, or hallucinations; she was oriented to person, place, and time; her short and long term memory were intact; and her insight and judgment were good.  Id. Dr. Amiri adjusted Claimant's medication.  Id.  at 715.

On December 24, 2018, Claimant saw Taslim Zaman, D.O. ("Dr. Zaman") for medication management.  Id. at 964.  Dr. Zaman noted that Claimant had a prior medical history of PTSD, polysubstance abuse, hypertension, hyperlipidemia, prediabetes, and sickle cell trait.  Id.  Claimant reported that: she was not sleeping better; she heard noises and someone calling her name at night;

she preferred to stay inside; and she had been compliant with her medication and denied having any adverse effects.  Id.  On mental status exam, Dr. Zaman noted that: Claimant had normal appearance, grooming, and hygiene; her attitude was cooperative; her eye contact was fair; her speech was coherent; her affect and mood were depressed; her thought process was goal-directed and logical; she denied suicidal or homicidal ideations, delusions, phobias, obsessions, or hallucinations; she was oriented to person, place, and time; her short and long term memory were intact; and her insight and judgment were fair.  Id. at 964-65.  Claimant was diagnosed with major depressive disorder and PTSD.  Id. at 965.  Dr. Zaman started Claimant on Gabapentin and adjusted her medication.  Id.  Dr. Zaman noted that Claimant was compliant with medications and stable. Id. at 966.

On January 16, 2019, Claimant followed up with Ms. Correa for individual therapy.  Id. at 889.  On mental status exam, Ms. Correa noted that: Claimant was oriented to person, place, time, and situation; her appearance, motor activity, and speech were within normal limits; her behavior was cooperative and engaged; her mood was angry; her affect was congruent; her thought content and processes were logical and goal-directed; her insight and judgment were good; she was moderately motivated; she denied suicidal or homicidal ideation, threat, gesture, or rehearsal attempt.  Id. at 890.  Claimant reported that her husband "put his hands on her" more than once, and that he was unfaithful since they got married; she discussed how his mistreatment of her impacted her emotionally.  Id.  Ms. Correa offered support and encouragement during the session. Id. at 891.

### B. Non-treating Sources

#### 1) State Agency Psychological Consultant Kevin Ragsdale, Ph.D. ("Dr. Ragsdale")

On January 26, 2018, Dr. Ragsdale completed a Psychiatric Review Technique ("PRT") for Claimant. Id. at 177-179. Dr. Ragsdale opined that Claimant had moderate difficulties in: understanding, remembering, or applying information; interacting with others; concentration, persistence, and maintaining pace; and adapting or managing herself. Id. at 178. Dr. Ragsdale opined that Claimant's alleged impairments were exclusively physical, although she had been experiencing anxiety/depression and isolating herself from others. Id. At reconsideration, Claimant supplied evidence from Community Health of South Florida where she gave a history of suggestive chronic PTSD, depression with suicidal ideation, Antisocial Personality Disorder, and substance abuse, yet acknowledged that she had never pursued any type of treatment. Id. Dr. Ragsdale opined that the acute onset of severe psychotic depression was suspect because the most severe variant of the disease is most often insidious and builds in terms of severity over time, and such a rapid descent into psychosis was most often due to drug use. Id. Dr. Ragsdale further opined that, regardless, Claimant's overall functioning over time was sufficient for performing solitary simple, routine, tasks, and any paranoid ideation and auditory or visual hallucinations should quickly remit since she had started taking an antipsychotic medication. Id.

### FUNCTION REPORT

On October 5, 2017, Claimant completed a function report in which she stated she experienced pain daily all over her body that was at 9 on a scale of 1-10. Id. at 349. She stated that she experienced pain when standing, walking, sitting, reaching, or experiencing temperature extremes. Id. She stated that she experienced pain every day and night at some point, and that she had tried all types of pain pills, including Advil and Percocet, which she borrowed from her cousin

because she did not have a prescription.  Id. at 350.  She stated that she did not experience any side effects from her medication.  Id.  Besides medication, she did not try any other forms of therapy or treatment for her pain except to move around to try to feel better from stiffness.  Id.  She stated that sometimes she did not cook or leave her bed.  Id.  She took care of her own personal care, such as bathing, hair care and dressing, but her husband helped with housecleaning, laundry, and shopping.  Id.  She stated that on some nights she took sleeping pills.  Id.  She stated that she only drove when she needed to; she did not have any social activities or hobbies; and she did not perform childcare or home maintenance.  Id. at 351.  She stated that sitting and standing caused her pain, and that she had to walk very slowly and carefully because her body hurt and was very stiff at times.  Id.

Claimant stated that she lived in an apartment with her husband, and that she was not able to work or stand for a long time due to pain from her stomach hurting, headaches, stiffness in joints, and back aches.  Id. at 359.  Claimant stated that she mostly spent time in bed, and that she would try to do housework after she medicated herself.  Id. 360.  She did not take care of anyone else, but she did take care of her dog and took him out for his walks.  Id.  Her husband also helped her care for the dog by walking him or bathing him.  Id.  She used to work in a daycare, but she could not do so anymore.  Id.  Claimant stated that: she experienced stiffness and pain getting dressed or bathing; she was okay using the toilet; she wore wigs a lot to avoid hair care; and she mostly only ate once a day.  Id.  She did not need reminders for her personal needs or taking medicine.  Id. at 361.

Claimant stated that she mostly used the microwave to make dinner, or her husband would cook.  Id.  When she felt okay, she tried to cook which took her between two minutes to half an hour.  Id.  Her cooking habits changed because of her pain; she did not want to stand for long.  Id.

She stated that she did laundry once a week and cleaning once a week, if she felt up to it, and it would take her all day because she did not rush.  Id.  She stated that her husband also helped with laundry and cleaning.  Id.

Claimant stated that she went outside as needed and she would ride in a car or use public transportation.  Id. at 362.  Sometimes she went out alone and sometimes she asked her husband to go with her.  Id.  She drove but it caused her pain, and she did not feel safe driving.  Id.  Once or twice a month, she shopped in stores for food and household needs, and it took her about two hours.  Id.  She stated that she was able to handle money.  Id.

Claimant stated that her hobbies were reading and watching TV and she did this daily.  Id. at 363.  She stated that sometimes, because of her pain, she stayed in bed for a week.  Id.

Claimant stated that she did not spend time with others or go anywhere on a regular basis unless she needed to.  Id.  She stated that she did not have problems getting along with friends or family.  Id.  She stated that, since her illness, she did not have company often because she did not feel well enough and wanted to stay in bed.  Id. at 364.  She stated that her condition affected her lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, concentrating, using her hands, and getting along with others because of pain. Id.  She stated that she could only lift 5 pounds because the stiffness in her joints hurt.  Id.  She stated that she was right-handed; she could walk half a block before needing to rest for 10-15 minutes; her ability to pay attention depended on her pain; she could not finish what she started; and she did not try to follow written or spoke instructions because she was not in the mood or did not feel like it.  Id.  She stated that she could get along with authority figures very well.  Id. at 365. Claimant stated that she did not handle stress well because she would get depressed and cry; she did not handle changes in routine well; and she cried a lot because her life had changed and she

felt useless and helpless.  Id. at 362.  She stated that she used a back brace every day for her pain which was prescribed by a doctor in 1999.  Id.  She stated that she took ibuprofen, Percocet, and pain pills, and that they did not cause any side effects.  Id. at 366.

## HEARING TESTIMONY

A hearing was held on February 12, 2019 before ALJ Cartledge, at which Claimant and VE Feder testified.  Id. at 115-153.

### I.    Claimant

Claimant testified that she left school in the eleventh grade because she got married; she did not get a GED, but she did go to vocational school.  Id. at 115.  She was right-handed, 5'4" tall and weighed 150 pounds.  Id.  She lived with her husband who was disabled.  Id. at 123.  Her husband was crippled but he was able to move around and help her with cooking and cleaning.  Id. at 123-24.  From 2009-2012, she worked at a daycare called Whiz Kids where she fed, changed, and played with infants and toddlers.  Id. at 124-25.  She stopped working there for one year in 2013 because work was slow, but she returned to the daycare from 2014-2106.  Id. at 125-26.  She stopped working in 2016 when she got sick, mentally and physically.  Id. at 126.  She stated that the kids at daycare were bothering her with their screaming and her chest hurt a lot.  Id.  At the daycare job, she had to lift babies and toddlers, who could weigh 35 pounds or more.  Id. at 128-29.  She left the job after she started getting chest pains and seeing a doctor, who eventually sent her to a psychiatrist and diagnosed her with anxiety and depression.  Id. at 129-130.  She started hearing voices and developed hallucinations.  Id. at 130.  She was put on medication and started seeing a psychiatrist every month and a therapist every week.  Id. at 130.  She started seeing her mother, who was deceased, in her house, and hearing voices in her head of people talking.  Id. at 131-32.  She was given medication which helped.  Id. at 132.

She stated that her chest hurt due to anxiety, and it happened frequently, and she did not leave the house often.  Id. at 133.  She did not go out and interact with people, except for seeing her therapist on Wednesdays.  Id. at 133-34.  She stated that her doctors gave her Vitamin D for her weak bones and wanted her to see a specialist for osteoporosis and go to physical therapy.  Id. at 134, 151.  She stated that she was prescribed a cane two weeks prior to the hearing because her doctor did not want her to fall.  Id.

Claimant stated that she earned around $15,000 annually at Whiz Kids, and she left around April or May of 2017 after she had taken time off to see doctors, because the director told her she was not reliable for the kids.  Id. at 135.  She stated that she could not go back to working in childcare because she could not take the screaming and the hollering anymore, even though she had been able to do the work up until a year and a half prior; she did not know what happened.  Id. at 137.  She stated that she also could not lift babies and toddlers anymore because her palms, arms, and neck hurt a lot.  Id. at 138.

Claimant stated that she had suffered the following traumas in her life, which she talked about with her therapist: the death of her mother when she was 14; having been on drugs all her life; having been raped; having been shot at; and having had her throat cut.  Id. at 139.  She stated that she never got help for the traumas previously, and that she was having mental health issues because of the traumas.  Id.

Claimant stated that she worked in housekeeping for Quality Inn from 2008-2012, before working at Whiz Kids.  Id. at 140.  In 2001, she also worked as a clerk cashier.  Id. at 141.  In her job as a housekeeper, she had to move heavy items, such as moving furniture to clean behind it or pushing up mattresses to clean them.  Id. at 143.  She also had to lift cots, get supplies from the storage rooms, and lift the vacuum cleaner which weighed 30-40 pounds.  Id.  She was paid

minimum wage as a housekeeper, plus small amounts of tips.  Id. at 144-45.   She had twelve

rooms to clean per day and had to be on her feet the entire time.  Id. at 145.

Claimant stated that her medication side effects made her sleepy; she went to sleep after

taking her medications in the morning, and she would sleep all day.  Id. at 146.  She had issues

interacting with strangers because she felt they would talk about her behind her back, so she did

not want to be around them.  Id.

## II.     VE Feder

VE Feder classified Claimant's prior work as follows:

> ➢ Daycare Worker, DOT #359.677-018,[8] with an exertional level of light and a Specific
>    Vocational Preparation (hereafter, "SVP") of 4;[9]

> ➢ Housekeeping Cleaner, DOT #323.687-014, with an exertional level of light and an
>    SVP of 2.[10]

Id. at 127, 142.  However, VE Feder testified that Claimant's actual performance level at both jobs

was at an exertional level of medium.  Id. at 147-48.[11]

ALJ Cartledge posed to VE Feder two hypotheticals for an individual of Claimant's age,

with her education and work experience who:

> 1) was limited to light work; except that the individual would be limited to only
>    occasionally (occasionally defined as cumulatively 1/3 or less of an 8 hour
>    workday) with general care, including up, more than 20 pounds; frequently

---

[8] DOT is the acronym for the Dictionary of Occupational Titles, which was created by the Employment and Training Administration and groups of jobs based on their similarities and defines the structure and content of all listed occupations.   See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

[9] SVP is defined in the DOT as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."   See Dictionary of Occupational Titles app. c (4th ed., rev. 1991), http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.   An SVP of 4 means that preparation for the job should take "[o]ver 3 months up to and including 6 months."  Id.

[10] An SVP of 2 means that preparation for the job should take "[a]nything beyond short demonstration up to and including 1 month."  http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

[11] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. §§ 404.1567(c) and 416.967(c).

(frequently being defined as cumulatively between 1/3 and 2/3 of an 8 hour workday) with general care, including up, with only 10 pounds; stand and/or walk with normal breaks for 6 hours in an 8 hour workday; sit with normal breaks for 6 hours in an 8 hour workday; no limits regarding pushing and pulling, including operation of hand and/or foot controls, except as otherwise shown for the general care in the hypothetical; can frequently climb ramps and stairs, ladders, ropes, and scaffolds; can frequently balance, stoop by bending at the waist, kneel, crouch (i.e., bending at the knees), and crawl; and must avoid concentrated exposure to extreme cold, humidity, and vibration; and is limited to unskilled, SVP 1 and 2 occupations of simple, routine, or repetitive tasks; limited to occasional interaction with the public, coworkers and supervisors; and limited to occasional work setting changes.  (Hypothetical No. 1).

2) had the same abilities as the individual in Hypothetical No. 1; except that the individual would be off task at least 10 minutes an hour outside normal breaks, not able to focus or stay on what she is supposed to be doing. (Hypothetical No. 2).

Id. at 147-49.

VE Feder testified that the individual in Hypothetical No. 1 would be able to perform Claimant's past relevant work as a housekeeping cleaner as classified by DOT but not as performed.  Id. at 149.  VE Feder further testified that the individual in Hypothetical No. 2 would not be able to perform any jobs.  Id.

### III.  Senior Vocational Rehabilitation Counselor, Job Placement Specialist, Paula F. Santagati, M.A. ("Ms. Santagati")

Prior to the hearing, on November 6, 2018, Claimant submitted the Vocational Opinion Reports of Ms. Santagati.  Id. at 401-405, 408-410.  At Claimant's request, Ms. Santagati reviewed Claimant's records to provide an assessment of her realistic vocational options, considering her limitations.  Id. at 402-405.  Ms. Santagati has a master's degree in Rehabilitation Counseling and over 26 years of experience in assisting individuals with disabilities to obtain employment.  Id. at 404.  She opined that, considering Dr. Ragsdale's opinions regarding Claimant's work limitations, Claimant would need an accommodated job in order to work, and even with accommodations, it was unlikely that she could sustain full time competitive employment.  Id. at 402.  Ms. Santagati

explained that the requirement for simple job instructions and routine work processes required an assessment of what constituted "simple" for Claimant, as there was substantial variability in how individuals perceive "simple." Id. Ms. Santagati opined that Claimant required changes to be introduced with advanced notice; that she required specialized placement to match her needs; and that, even if accommodations were provided, there was no way to guarantee they would meet her needs. Id. at 403. Ms. Santagati further opined that there was no way to guarantee that specialized placement would accommodate Claimant's limitation on her ability to interact with others, and that people with limitations on their ability to interact are not sought after and retained by most employers. Id. at 403.

On February 5, 2019, Ms. Santagati provided a follow-up opinion on the vocational assessment of Claimant's past work. Id. at 408-10. Ms. Santagati opined that Claimant's prior work as housecleaner, laborer, salesclerk, and daycare provider required a medium level of exertion as generally performed. Id. at 408. Ms. Santagati concluded that Claimant was unable to sustain past work as actually performed or as generally performed. Id. at 410.

## STANDARD OF REVIEW

A federal court's "review of a social security case is demarcated by a deferential reconsideration of the findings of fact and exacting examination of the conclusions of law." Williams v. Astrue, 416 F. App'x 861, 862 (11th Cir. 2011). Thus,

> [t]he Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.

Kieser v. Barnhart, 222 F. Supp. 2d 1298, 1305 (M.D. Fla. 2002) (citations omitted). However,

the Commissioner's "conclusions of law, including applicable review standards, are not presumed valid." Williams, 416 F. App'x at 862.

### REGULATORY FRAMEWORK:  THE FIVE-STEP SEQUENTIAL PROCESS

The Social Security Regulations outline a five-step "sequential" evaluation process used to determine whether a claimant is disabled.

First, the ALJ must determine whether a claimant is engaged in "substantial gainful activity" (hereafter, "SGA").  If the ALJ finds that the claimant is engaging in SGA, then the ALJ must find that the claimant is not disabled.  Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004).  In this case, ALJ Cartledge determined that Claimant had not engaged in SGA since April 5, 2017, the alleged onset date.  TR. 100.

At the second step, the ALJ must determine if a claimant's impairments are "medically severe."  If the ALJ determines that the claimant's impairments are medically severe, then he or she must proceed to the third step.  Phillips, 357 F.3d at 1237.  In this case, ALJ Cartledge found that Claimant suffered from the following severe impairments: other and unspecified arthropathies; peripheral arterial disease; and depressive, bipolar, and related disorders.  TR. 100.  ALJ Cartledge then proceeded to step three.  Id. at 101.

At step three, the ALJ must determine if a claimant's impairment(s) "meet or equal" any of the listed impairments in the regulations.  Phillips, 357 F.3d at 1238.  If so, the ALJ must find the claimant disabled; if not, then the ALJ should proceed to step four.  Id.  Here, ALJ Cartledge determined that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  TR. 101.  Therefore, ALJ Cartledge proceeded to step four.  Id.

Step four is a two-pronged process, which first requires the determination of a claimant's RFC and then, based on that RFC, a determination of whether the claimant can return to any "past relevant work." Phillips, 357 F.3d at 1238. As to the first prong, ALJ Cartledge determined that Claimant had the RFC to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant could only occasionally (occasionally defined as cumulatively 1/3 or less of an 8 hour workday) lift and/or carry (including upward pulling) 20 pounds and frequently (frequently being defined as cumulatively between 1/3 and 2/3 of an 8 hour workday) lift and/or carry (including upward pulling) 10 pounds; stand and/or walk (with normal breaks) for a total of 6 hours in an 8 hour workday; sit (with normal breaks) for a total of 6 hours in an 8 hour workday; and no limits regarding pushing and/or pulling (including operation of hand and/or foot controls), except as otherwise shown for lift and/or carry in this residual functional capacity. The claimant can frequently climb ramps/stairs, climb ladders/ropes/scaffolds; balance, stoop (i.e., bending at the waist); kneel; crouch (i.e., bending at the knees); and crawl. The claimant must avoid concentrated exposure to extreme cold; humidity; and vibration. The claimant is limited to unskilled [SVP] levels 1 and 2 occupations of simple, routine, and repetitive tasks limited to occasional interaction with the public, co-workers, and supervisors, and limited to occasional work-setting changes. The claimant can frequently [engage in] bilateral handling and fingering.

TR. 103.

Based on Claimant's RFC, ALJ Cartledge moved to prong two of step four and concluded that Claimant was capable of performing past relevant work as a daycare worker and as a housekeeping cleaner. Id. at 109. Respondent notes that ALJ Cartledge's finding that Claimant could perform her past relevant work as a daycare worker is not supported by the record. See Respondent's Motion for Summary Judgment [D.E. 19 at 7 n.2]. However, as long as a claimant can return to any past relevant work, the ALJ will properly conclude that the claimant is not disabled. Phillips, 357 F.3d at 1238. Because ALJ Cartledge found that Claimant could perform her past relevant work as a housekeeping cleaner, the inclusion of past relevant work as a daycare

worker does not impact the five-step sequential evaluation process.  Id.[12]

Therefore, ALJ Cartledge concluded that Claimant was not under a disability, as defined in the Social Security Act, from April 5, 2017, through the date of the Unfavorable Decision.  Id.

## DISCUSSION

As noted above, Claimant argues that:

I.      The ALJ erred by failing to make findings regarding Claimant's need for an assistive device.

II.     The ALJ erred by mischaracterizing the nature of, and failing to properly address, probative vocational evidence demonstrating Claimant cannot perform her past work.

See Claimant's Motion for Summary Judgment [D.E. 18-2].  The undersigned finds no merit in either of the contentions.

### I.      Whether the ALJ erred in by failing to make findings regarding Claimant's need for an assistive device.

Claimant argues that she was prescribed a cane for her "weak bones" approximately two weeks prior to the hearing, and that ALJ Cartledge erred in failing to consider how this impacted the RFC assessment.  See Claimant's Motion for Summary Judgment [D.E. 18-2 at 3-6].

"The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis."  SSR 96-8p.[13]  Further, "[t]he RFC assessment must include a narrative discussion describing how the

---

[12]  If the ALJ had concluded that Claimant was not able to perform any past relevant work, he would have proceeded to the fifth and final step.  Step five requires the ALJ to determine whether the claimant is able to do any work considering the claimant's age, education, work experience, and RFC.  Id. at 1239-40.  If the claimant has the ability to adjust to other work in the national economy, then the claimant is not disabled. Id.

[13]  SSR 96-8p sets forth the SSA's policies and policy interpretations regarding the assessment of a claimant's RFC.  SSR 96–8p, 1996 WL 374184 (July 2, 1996).  According to this policy interpretation, the

evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  Id.  "In all events, there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision is not a broad rejection which is 'not enough to enable the district court or this Court to conclude that the ALJ considered her medical condition as a whole.'"  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (alterations omitted) (quoting Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995)).  The ALJ's "opinion must describe his analysis with enough detail to satisfy a reviewing court that he gave all of the relevant evidence before him its due regard." Turner ex rel. Turner v. Barnhart, 377 F. Supp. 2d 1165, 1168 (M.D. Ala. 2005).  When substantial evidence supports the ALJ's decision, it must be affirmed.  Strickland v. Comm'r of Soc. Sec., 516 F. App'x 829, 831 (11th Cir. 2013) ("We may not reweigh the evidence and decide facts anew and must defer to the ALJ's decision if it is supported by substantial evidence even if the evidence may preponderate against it.") (citing Dyer, 395 F.3d at 1210).

Claimant further argues that the RFC must describe all of the practical effects of all of Claimant's impairments, and when the record establishes that a claimant needs a hand-held assistive device, such as a cane, the ALJ must always consider (1) the extent to which it is medically necessary; and (2) the work-related limitations that result from the need for the cane. Id. at 4-5 (citing Social Security Ruling 96-9p.).

Social Security Ruling 96-9p provides in relevant part:

[T]here must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain

---

Commissioner is required to consider all relevant evidence in the case record in making the RFC determination.  Id.; see also Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997) ("The [RFC] is an assessment, based upon all of the relevant evidence, of a claimant's remaining ability to do work despite his impairments.") (citing 20 C.F.R. § 404.1545(a)).

situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case.

Social Security Ruling 96-9p. "Under SSR 96-9p, a claimant must present medical documentation (1) establishing her need for a cane or other device and (2) describing the circumstances for which it is needed. Without that showing, an ALJ is not required to include the use of a cane in a claimant's RFC." Williams v. Acting Comm'r of Soc. Sec. Admin., 2019 WL 2511592, at *3 (M.D. Fla. June 18, 2019) (internal citations omitted).

In Claimant's Function Report, Claimant was specifically asked if she used a cane and she indicated that she did not. Id. at 365. Further, as noted by ALJ Cartledge, Dr. Martinez's February 14, 2018 consultative medical exam stated as follows:

> "[Claimant] stood with her feet straight, and she was well balanced. Her gait was normal. She had no limps noted. The claimant was able to walk on her toes and heels without difficulty. ***The claimant also did not use any assistive devices to ambulate***. She also did not need help changing for the exam, and was able to rise from the chair and examining table without difficulty.
>
> The claimant had no clubbing, cyanosis, or edema in her extremities. . . . The claimant had no atrophy, and there was no muscular weakness or loss of motor activity in any extremity. . . .  The claimant also had no muscular wasting or palpable bony or joint abnormalities. Her bilateral muscle tone and strength were normal , with a 5/5 on a scale of 5/5. The claimant's straight leg raising, supine and sifting, where within normal range. She also showed no evidence of subluxation, contractures, ankylosing, swelling, erythema or fluid in her joints.

Id. at 105-106 (emphasis added) (internal citations omitted). ALJ Cartledge also noted that Claimant was able to walk her dog every day; that her gait and stance were consistently noted as normal in the medical record; that Claimant reported that her pain improved when she went out for walks; and that her doctor encouraged her to walk or her muscles and joints would get stiff. Id. at 102, 106.

Claimant acknowledges that she did not require a cane before, but she argues that her condition deteriorated before the hearing to the point where she required a cane. See Claimant's

Motion for Summary Judgment [D.E. 18-2 at 6]; Claimant's Reply Brief [D.E. 21 at 2].  In support of her argument, Claimant cites to the following medical records: (1) the September 14, 2018 physical exam with Dr. Ramsahai where she reported increased pain; (2) the December 24, 2018 medication management appointment where Dr. Zaman prescribed Gabapentin for nerve pain; and (3) the prescription for a cane on January 30, 2019.  See Claimant's Motion for Summary Judgment [D.E. 18-2 at 6]; T.R. 762, 965, 414.  The first two items make no reference to a cane being medically required.  With regard to the third item, "the legal issue does not turn on whether a cane was 'prescribed' for [the claimant], but whether a cane was 'medically required.'"  Spaulding v. Astrue, 379 F. App'x 776, 780 (10th Cir. 2010) (quoting Social Security Ruling 96–9p)). Moreover, ARNP Thermezy's January 9, 2019 notation that Claimant sometimes used a cane to ambulate does not establish that it was medically required.  Given such record, there was no basis for ALJ Cartledge to consider the use of a cane in formulating Claimant's RFC.

Based on the foregoing, the undersigned concludes that ALJ Cartledge did not err in failing to make findings about Claimant's need for a cane in formulating Claimant's RFC assessment. Strickland, 516 F. App'x at 831 ("We may not reweigh the evidence and decide facts anew and must defer to the ALJ's decision if it is supported by substantial evidence even if the evidence may preponderate against it.")

## II.   Whether the ALJ erred by mischaracterizing the nature of, and failing to properly address, probative vocational evidence demonstrating Claimant cannot perform her past work.

Claimant argues that the ALJ weighed Ms. Santagati's vocational opinion reports as if they were medical opinions when they should have been reviewed as rebuttal evidence to VE Feder's testimony, and that the ALJ's failure to address her challenges to VE Feder's testimony is error that requires remand.  See Claimant's Reply [D.E. 21 at 3-4].  Claimant relies on Prince v.

Berryhill, 2018 WL 11346752 (S.D. Fla. June 21, 2018), where the ALJ gave "little weight" to the

rebuttal evidence of Ms. Santagati's vocational expert reports and gave "more weight" to the VE

who appeared at the hearing because the VE "was subject to questioning" by the ALJ and the

plaintiff's attorney.  The court found that the ALJ failed to properly address the rebuttal evidence

because the ALJ's discussion was limited to procedural discussion, and there was no substantive

discussion.  Id. at *4.  Claimant also relies on Sams v. Berryhill, 2017 WL 3974239 (N.D. Fla.

Sept. 8, 2017), where the plaintiff submitted post-hearing objections and evidence as to the VE's

testimony that were not addressed by the ALJ in his decision.  The court remanded to the ALJ to

reconsider and expressly rule on the plaintiff's objections.  Id. at *8.[14]

     In contrast to what transpired in Prince and Sams, ALJ Cartledge did not fail to address

Claimant's challenge to VE Feder's testimony.  Moreover, as noted by Respondent, although the

regulations do not require an ALJ to articulate how he considered evidence from a non-medical

source, ALJ Cartledge did so.  See Respondent's Motion for Summary Judgment [D.E. 19 at 7]

(citing 20 C.F.R. §§ 404.1520c(d), 416.920c(d) ("We are not required to articulate how we

considered evidence from nonmedical sources using the requirements in paragraphs (a)-(c) in this

section.").  Specifically, ALJ Cartledge analyzed Ms. Santagati's opinion reports as follows:

> This assessment is not supported by the relevant objective medical evidence and is
> inconsistent with evidence from other medical and nonmedical sources.  For
> example, the claimant stated that she was able to take [care] of her own personal
> needs such as bathing, hair care and dressing.  She stated that she was able to walk
> her dog, and cook her own meals.  The claimant reported that she did her own
> laundry, and cleaned her house once a week.  She reported that she went outside of
> her house "as needed," and rode in a car and used public transportation.  The
> claimant drove a car, and shopped for her own food and household needs at stores.
> She stated that she could pay her own bills, count change, handle a savings account,
> and use a checkbook.  The claimant appeared well groomed and dressed.  The
> claimant related normally and denied any illusions, delusions, hallucinations, or

---

[14] Claimant cites to several other cases where the VE's testimony was challenged for relying exclusively
on a private software program called SkillTran instead of the VE's own knowledge and expertise.  Because
those circumstances are not present here, these additional cases are inapposite.

> suicidal tendencies.  She was well oriented to person, place and time and well informed.  She denied any constrictions of interest or restriction of activities other than those imposed on her by her generalized aches and pains.  The claimant performed simple arithmetic arcuately and rapidly.  She was able to recall[] 4 objects out of 5 after approximately 20 minutes and perform two-step instructions without difficulties.  The claimant appeared able to manage her own finances well.

Id. (internal citations omitted).

Thus, to the extent that ALJ Cartledge erred in weighing Ms. Santagati's opinion reports as if they were a medical source opinion, such error was harmless, given that he gave full consideration to the substance of the opinion reports.  Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988) ("The major policy underlying the harmless error rule is to preserve judgments and avoid waste of time.").

Because the ALJ fully addressed Ms. Santagati's opinion reports and his findings are supported by substantial evidence, the undersigned finds no merit in Claimant's second argument. Strickland, 516 F. App'x at 831 ("We may not reweigh the evidence and decide facts anew and must defer to the ALJ's decision if it is supported by substantial evidence even if the evidence may preponderate against it.").

## **RECOMMENDATION**

Based on the foregoing considerations, the undersigned RESPECTFULLY RECOMMENDS that Claimant's Motion for Summary Judgment [D.E. 18] be DENIED, the Commissioner's Motion for Summary Judgment [D.E. 19] be GRANTED, and the Commissioner's decision be AFFIRMED.

Pursuant to Local Magistrate Judge Rule 4(b), the parties have **fourteen days** from the date of this Report and Recommendation to file written objections, if any, with the Honorable Jose E. Martinez, United States District Judge.  Failure to file timely objections may bar the parties from attacking the factual findings contained herein on appeal.  See Resolution Tr. Corp. v. Hallmark

Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).  Further, "failure to object in accordance

with the provisions of [28 U.S.C.] § 636(b)(1) waives the right to challenge on appeal the district

court's order based on unobjected-to factual and legal conclusions."  See 11th Cir. R. 3-1 (I.O.P.

- 3).

RESPECTFULLY SUBMITTED in Chambers at Miami, Florida, this <u>22nd</u> day of

November, 2021.

ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc:   United States District Judge Jose E. Martinez
      Counsel of Record